Filed
D.C. Superior Court
03/05/2021 20:49PM
Clerk of the Court

## THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Actions Branch

| | |
|---|---|
| **SUE LEE**<br>**4716 32nd Street NW**<br>**Washington, DC 20008,** | )<br>)<br>)<br>) |
| **Plaintiff,**<br>**v.** | )<br>)<br>) |
| **PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD**<br>**1666 K St NW, #800**<br>**Washington, DC 20036,** | ) **DEMAND FOR**<br>) **JURY TRIAL**<br>)<br>) |
| **SERVE:**<br>**Kenneth R. Lench, Esq., General Counsel**<br>**1666 K Street NW, #800**<br>**Washington, DC 20036,** | )<br>)<br>)<br>) |
| **and** | )<br>) |
| **WILLIAM D. DUHNKE III**<br>**11687 Chanceford Drive**<br>**Woodbridge, VA 22192** | )<br>)<br>)<br>) |
| **Defendants.** | )<br>) |

## COMPLAINT

Plaintiff Sue Lee ("Ms. Lee"), by undersigned counsel, hereby states as follows for her Complaint against the Public Company Accounting Oversight Board ("PCAOB") and Mr. William D. Duhnke III ("Mr. Duhnke" and, together with PCAOB, the "Defendants") (each a "Party," and together "the Parties"):

### Nature of the Case

1. This action arises from Defendants' unlawful termination of Ms. Lee in October of 2020 on the basis of her Asian ethnicity, Chinese national origin, and political affiliation with the Democratic Party in violation of the D.C. Human Rights Act.   Despite Ms. Lee's exceptional

1

performance as a senior officer of the organization, PCAOB's Chairman, Mr. Duhnke, perpetrated a xenophobic and racist campaign against Ms. Lee on account of her membership in these protected classes, ultimately culminating in Ms. Lee's termination from PCAOB and the intentional tarnishing of her professional reputation through the assertion of pretextual and baseless allegations of misconduct.  Ms. Lee initiated this action under the D.C. Human Rights Act to recover monetary compensation for her loss of wages, reputational harm, and emotional distress, reimbursement for her legal fees and costs incurred in pursuing her claims, and an award of punitive damages to punish Defendants for their brazen and intentional violations of law, and to deter their repetition of such misconduct in the future.

### The Parties

2. Ms. Lee is a citizen of the District of Columbia whose primary residence is located at 4716 32nd Street NW, Washington, DC 20008.  Ms. Lee is an experienced attorney who has served as General Counsel and/or corporate counsel for numerous business entities over the past sixteen (16) years.

3. Upon information and belief, PCAOB is a non-profit corporation formed under the laws of the District of Columbia with its principal place of business located at 1666 K St NW, #800, Washington, DC 20036.

4. Upon information and belief, Mr. Duhnke is a citizen of the Commonwealth of Virginia and the Chairman of PCAOB's governing board, with his primary residence located at 11687 Chanceford Drive, Woodbridge, VA 22192.

**Jurisdiction and Venue**

5.  This Court has personal jurisdiction over PCAOB because the organization's principal place of business is located in the District of Columbia, and Ms. Lee's claims against PCAOB arise from discriminatory conduct by the organization that took place within this jurisdiction.

6.  This Court has personal jurisdiction over Mr. Duhnke because he conducts substantial business within this jurisdiction, including by serving as the Chairman of PCAOB, and Ms. Lee's claims against Mr. Duhnke arise from his discriminatory and unlawful actions that took place within this jurisdiction.

7.  Venue is proper in the District of Columbia because a substantial portion of the events giving rise to this action took place within this jurisdiction.  Specifically, Defendants unlawfully subjected Ms. Lee to adverse employment actions during her tenure with PCAOB, which was based, at all relevant times, at the organization's Washington, D.C. headquarters.

**Ms. Lee's Employment with PCAOB**

8.  In February of 2019, Ms. Lee accepted employment with PCAOB as the organization's Chief Risk Officer.

9.  Throughout her employment with PCAOB, Ms. Lee reported directly to Mr. Duhnke—a white male and Chairman of the organization—who determined the terms of Ms. Lee's employment, including her salary and benefits, without oversight or input by any other person.

10. In July of 2019, in recognition of her strong performance to date, PCAOB's governing board (the "Board") promoted Ms. Lee to serve as PCAOB's acting Chief Administrative Officer ("CAO").

3

11. As CAO of PCAOB, Ms. Lee was tasked with overseeing the daily operations of PCAOB, including those of its Washington, D.C. headquarters and the organization's regional and satellite offices.

12. During her tenure as CAO, Ms. Lee was tasked with frequently visiting each of PCAOB's regional and satellite offices to assess occupancy and use rates and identify organizational changes that could increase the efficiency of PCAOB's operations.

13. Ms. Lee compiled the data from her visits to these regional and satellite offices in written reports for Mr. Duhnke, and updated Mr. Duhnke about her office visits at her meetings with Mr. Duhnke, which occurred at least weekly.

14. During these work travels, Ms. Lee identified PCAOB's maintenance of offices in Boston, Massachusetts as an inefficient use of the organization's resources and, at Mr. Duhnke's instruction, worked to transition this satellite office to a more affordable suburb in the Boston area.

15. This office transition further necessitated Ms. Lee's regular travel to Boston from Washington, D.C., all of which was necessitated by her duties as CAO, approved beforehand by PCAOB, and reported by Ms. Lee to Mr. Duhnke.

16. Ms. Lee's efforts in ensuring the efficient operations of PCAOB's regional and satellite offices did not go unnoticed by PCAOB's Board and executives.

17. Specifically, in December of 2019, Mr. Duhnke praised Ms. Lee's performance as acting CAO and provided her with an exemplary performance review.

18. PCAOB further awarded Ms. Lee with a discretionary bonus and, at the end of 2019, promoted her to serve as the organization's permanent CAO.

19. In February of 2020, during the Annual Inspector Training conference attended by over five hundred (500) PCAOB employees, Mr. Duhnke informed the conference attendees that Ms. Lee was making multiple visits to the regional and satellite offices, and specifically to the Boston-area offices, as part of the geographic assessment project the Board authorized.

20. Based on the data Ms. Lee compiled from her regional and satellite office visits, PCAOB resolved to close five satellite offices, including its recently opened Boston-area office, and transition all impacted employees to work remotely full time.

21. As the organization's CAO, PCAOB and Mr. Duhnke tasked Ms. Lee with these transitional efforts, again requiring Ms. Lee to regularly travel to the Boston area to oversee the closure of PCAOB's satellite office space.

22. All such travel was necessitated by Ms. Lee's duties as CAO, approved beforehand by PCAOB, and reported to Mr. Duhnke by Ms. Lee and/or her staff.

23. Mr. Duhnke's knowledge of Ms. Lee's frequent travel to Boston in furtherance of her CAO duties was further demonstrated by Mr. Duhnke asking Ms. Lee for directions from the Boston airport to downtown Boston on February 12, 2020.

24. Upon information and belief, there is no record of misconduct or complaints about Ms. Lee's performance in her PCAOB employee files.

25. Upon information and belief, PCAOB's Ethics Office have not received any reports of misconduct or ethical violations by Ms. Lee.

26. As permanent CAO, Ms. Lee continued to report directly to Mr. Duhnke as Chairman of the Board.

27. Pursuant to PCAOB's bylaws, Ms. Lee could not be removed from her CAO position without prior consultation with, and approval by, the Board.

28. In violation of PCAOB's policies and procedures, upon information and belief, Mr. Duhnke Mr. Duhnke failed to review Ms. Lee's termination in advance with employment counsel and did not obtain the written approval of the Chief Human Resources Officer prior to Ms. Lee's termination.

**Defendants' Discriminatory Conduct Toward Ms. Lee**

29. Despite his prior praise of Ms. Lee, beginning in the spring of 2020—almost immediately following the well-publicized arrival of the COVID-19 pandemic in the United States—Mr. Duhnke began exhibiting increasingly discriminatory behavior toward Ms. Lee due to her Chinese ethnicity and national origin.

30. Specifically, Mr. Duhnke regularly referred to the ongoing COVID-19 pandemic as the "kung flu" and the "Chinese flu" within Ms. Lee's presence.

31. During this time period, Mr. Duhnke also began making frequent remarks to Ms. Lee and other PCAOB employees about Ms. Lee's Chinese ancestry and birth overseas.

32. The abrupt change in Mr. Duhnke's treatment of Ms. Lee coincided with the initial outbreak of the coronavirus in the United States – an event which Mr. Duhnke appeared to blame upon the Chinese population and foreign nationals at large.

33. Mr. Duhnke mocked Ms. Lee for wearing a mask in the office and drew similarities to Chinese Communist Party leaders wearing masks after causing the coronavirus.

34. Mr. Duhnke repeatedly directed Ms. Lee to remove her mask whenever she spoke to him in PCAOB's DC headquarters over Ms. Lee's protests and in violation of then-applicable health and safety advisories.

35. In September of 2020, upon seeing some Chinese-language journals outside Ms. Lee's office in Washington, D.C., Mr. Duhnke asked several of Ms. Lee's direct reports, as well as

PCAOB's security team, whether "some Chinese national snuck Chinese propaganda into the office."

36. Mr. Duhnke's frequent use of insensitive nomenclature with respect to the pandemic and his ongoing remarks to Ms. Lee and her colleagues about Ms. Lee's Chinese ancestry caused Ms. Lee emotional distress, and made her increasingly uncomfortable in PCAOB's workplace.

37. Also during this time, Mr. Duhnke increasingly targeted Ms. Lee following his discovery of her affiliation with the Democratic Party after noticing a picture of her with Elizabeth Warren in Ms. Lee's office, as well as other items suggesting Ms. Lee's support for the Black Lives Matter Movement.

38. Mr. Duhnke expressed surprise upon learning of Ms. Lee's political affiliation, and stated that he had always presumed Ms. Lee was politically conservative.

39. Mr. Duhnke made no secret of his affiliation with the Republican Party and regularly made his political differences with Ms. Lee a central topic of their conversations.

40. During these conversations, Mr. Duhnke also referred to Ms. Lee "taking the red pill," a phrase associated with far-right conservativism.

41. Mr. Duhnke further touted multiple politically-motivated agendas regarding PCAOB's future that he intended to effectuate as Chairman and that did not align with Ms. Lee's own political beliefs, including replacing politically liberal PCAOB personnel with personnel who are politically conservative and shutting down PCAOB, which Mr. Duhnke expressly viewed as a frivolous organization that should be combined with the U.S. Securities and Exchange Commission.

42. In furtherance of a discriminatory animus toward Ms. Lee, upon information and belief, Mr. Duhnke intended these statements regarding Ms. Lee's Chinese ancestry, national origin, and Democratic affiliation to make Ms. Lee feel insecure about her position with PCAOB, and incentivize her departure from the organization.

**Defendants' Termination of Ms. Lee**

43. Notwithstanding Mr. Duhnke's harassment of Ms. Lee during 2020, Ms. Lee continued to effectively perform her position as CAO, including maintaining an exhausting travel schedule required by PCAOB's organizational changes and office closures.

44. However, on October 19, 2020, Ms. Lee suddenly lost access to her PCAOB work email and cell phone without any advance notice or explanation provided by PCAOB.

45. Upon being able to reach Mr. Duhnke around two hours later, Mr. Duhnke asserted that Ms. Lee was being suspended immediately due to charges of misconduct that had been leveled against her.

46. Given this investigation, Mr. Duhnke stated that he had unilaterally directed the suspension of Ms. Lee's access to her PCAOB devices and e-mail account.

47. Mr. Duhnke further asserted that PCAOB was compiling a report detailing the nature of these charges, and that Ms. Lee would have the opportunity to review and respond to this report when it was complete.

48. However, Ms. Lee received no further contact from PCAOB over the following four days, and was never provided with a copy of PCAOB's report or an opportunity to respond to such.

49. On October 23, 2020, Mr. Duhnke telephoned Ms. Lee and informed her that her employment with PCAOB was terminated effective immediately.

50. Upon Ms. Lee's protest, Mr. Duhnke cited her travel to the Boston area, which he described as "ridiculous," and incorrectly asserted that she had made 36 trips to the Boston offices that year.

51. Mr. Duhnke's attempts to justify the Defendants' termination decision upon Ms. Lee's travel to the Boston area were misplaced, because all such travel was necessitated by her duties as PCAOB's CAO, approved by the organization beforehand, and reported to Mr. Duhnke.

52. When Ms. Lee corrected Mr. Duhnke with respect to her travel, and requested a copy of the investigative report to which he had referred during their prior conversation, Mr. Duhnke refused to turn the report over, and pivoted on his basis for her termination by stating that Ms. Lee was an at-will employee and could be terminated at any time without reason.

53. Upon information and belief, given his stated responsibility for suspending Ms. Lee's access to her work cell phone and e-mail on October 19, 2020, Mr. Duhnke failed to consult and obtain the approval of the Board before terminating Ms. Lee, as otherwise required PCAOB's bylaws.

54. Alternatively, if Mr. Duhnke did consult the Board prior to Ms. Lee's termination, Mr. Duhnke provided the Board with false and pretextual reasons warranting her termination, which the Board acted upon improperly.

55. In violation of PCAOB's policies and procedures, upon information and belief, Mr. Duhnke failed to review Ms. Lee's termination in advance with employment counsel and did not obtain the written approval of the Chief Human Resources Officer prior to Ms. Lee's termination.

56. Upon information and belief, Mr. Duhnke's disregard for otherwise established company protocol with respect to the termination of senior officers—a process Ms. Lee was well

9

familiar with in her capacity as CAO—and his unilateral decision to terminate Ms. Lee were motivated by a discriminatory animus toward Ms. Lee's ethnicity, national origin, and political affiliation.

57. Tellingly, following PCAOB's termination of Ms. Lee, Mr. Duhnke selected a white, conservative female to replace Ms. Lee as CAO.

58. Mr. Duhnke's abrupt termination of Ms. Lee not only violated PCAOB policies and the protections afforded her position by PCAOB's own bylaws, but also lay in stark contrast to the organization's treatment of other senior employees.

59. Prior to Ms. Lee's termination in October of 2020, in every other instance of involuntary termination of a PCAOB senior employee, the organization followed the prescribed PCAOB policies and procedures, which included PCAOB HR documenting in writing each step of the separation process, including the placement of the impacted senior employee on administrative leave, notice of termination, separation agreement, and out-processing.

60. Prior to Ms. Lee's termination in October of 2020, and in every other instance of alleged misconduct by a senior PCAOB employee, the organization conducted a rigorous and well-documented investigation in which the employee under investigation was also permitted to participate and offer evidence in their defense.

61. PCAOB further afforded white employees charged with misconduct, none of whom had been previously targeted due to their political affiliation, significantly more due process during initiated investigations, which would often not result in any adverse employment action even upon a finding of misconduct.

62. By way of example, in 2018, a PCAOB regional associate director located in New York—a white male—was investigated over several months for chronic absenteeism and

misrepresenting his hours worked to the organization.  Despite this misconduct, that regional associate director remains employed by PCAOB.

63. In 2019, the Securities and Exchange Commission initiated an investigation of Mr. Duhnke regarding allegations of assault, misuse of office, fraud, waste, abuse, breaches of fiduciary duty, retaliation, discrimination, and wrongful termination.  Despite this investigation continuing for over twenty months (20) to date, PCAOB did not suspend Mr. Duhnke during its pendency or take other adverse action against him given the seriousness of the charges at issue.

64. Even in situations where PCAOB ultimately determined misconduct warranting termination had occurred, PCAOB provided these outgoing senior employees with generous exit packages upon their separation.

65. On the other hand, PCAOB offered Ms. Lee no exit package upon her unceremonious firing despite no serious charges of misconduct being levied against Ms. Lee at any time during her employment, as well as Mr. Duhnke's inconsistent and pretextual reasons for her termination.

66. Moreover, when Ms. Lee contacted PCAOB through counsel to express her concern regarding Mr. Duhnke's discriminatory conduct during Ms. Lee's employment and the suspected unlawful motivations for her termination in October of 2020, PCAOB offered yet a *third* reason for its termination of Ms. Lee.

67. Specifically, and notwithstanding Mr. Duhnke's statements in October of 2020 that PCAOB was terminating Ms. Lee due to excessive work travel and, later, for no reason and due to her status as an at-will employee, in November of 2020, PCAOB based Ms. Lee's separation upon her allegedly unsatisfactory performance in connection with an internal project

involving the implementation of a financial and human resources information management software.

68. However, not only did PCAOB's allegations of poor performance contrast markedly with Ms. Lee's exemplary reviews during her employment and rapid elevation within the organization, but Ms. Lee had at no time during her PCAOB employment assumed supervision of, or been substantially involved in, the internal project to which the organization referenced.

69. Rather, PCAOB's ever-changing reasoning for Ms. Lee's separation was pretextual, and intended only to conceal the true, discriminatory motivations of the organization and its Chairman.

## COUNT I – VIOLATION OF DC CODE. § 2-1402.11
### (Discrimination Based on Political Affiliation, Race, and National Origin)
### (Against Both Defendants)

70. Ms. Lee restates and incorporates the allegations contained in Paragraphs 1 through 69 above as if each had been fully set forth herein.

71. Beginning in March of 2020, and despite Ms. Lee's exemplary performance as PCAOB's CAO, Mr. Duhnke resolved to effectuate Ms. Lee's voluntary or involuntary separation from the company due to her Chinese ancestry, foreign birth, and affiliation with the Democratic Party.

72. Mr. Duhnke subjected Ms. Lee to a hostile work environment through his relentless and discriminatory comments regarding her membership in these protected classes.

73. In October of 2020, Defendants unjustifiably suspended Ms. Lee in violation of company protocol due to PCAOB's supposed investigation of misconduct by Ms. Lee.

74. To the extent the organization did carry out any investigation of alleged misconduct by Ms. Lee, PCAOB, through Mr. Duhnke, treated Ms. Lee in a disparate manner relative to her white colleagues who had not been targeted due to their respective political affiliations, including by failing to allow her to participate in the investigation and respond to the false allegations at issue.

75. Only four days later, PCAOB, through Mr. Duhnke, terminated Ms. Lee's employment with PCAOB despite having retained white employees, who were not previously targeted due to their respective political affiliations, but had engaged in proven and serious instances of misconduct.

76. Upon information and belief, Mr. Duhnke circumvented company protocol and procedures to terminate Ms. Lee while she was suspended before formal conclusion of the internal investigation process.

77. Following Ms. Lee's separation, Mr. Duhnke effectuated his discriminatory agenda by replacing Ms. Lee with a white, conservative employee to serve as the organization's new CAO.

78. PCAOB further treated Ms. Lee in a disparate manner relative to previously-terminated white employees, who had not been targeted due to their respective political affiliations, by refusing to offer her any severance benefits upon her departure.

79. The non-discriminatory reasons proffered by PCAOB for Ms. Lee's termination have been markedly inconsistent and constitute a pretext for unlawful discrimination.

80. Ms. Lee has suffered damages due to Defendants' discriminatory conduct, including loss of wages, reputational harm and emotional distress, and has further incurred significant legal fees and costs seeking relief through this action.

81. Mr. Duhnke is individually liable for any monetary damages that Ms. Lee may establish through this action, because he acted in the interests of PCAOB when unlawfully subjecting Ms. Lee to discriminatory harassment and adverse employment actions over the course of 2020.

82. The Defendants further aided and abetted one another in furtherance of a discriminatory campaign against Ms. Lee through their sanctioning of the adverse employment actions taken against her and advancements of inconsistent and fabricated reasons for Ms. Lee's termination to conceal their underlying discriminatory agenda.

WHEREFORE, Ms. Lee respectfully prays that this Court enter the following relief:

A. Entry of a money judgment against in the amount of all unpaid backpay accrued by Ms. Lee since her discriminatory termination by PCAOB;

B. An award of reasonable front pay;

C. An award of punitive damages against Defendants;

D. An award of reasonable attorney's fees and costs incurred in pursuing this action;

E. An award of such further relief as this court sees just and proper under the circumstances.

Dated:  March 5, 2021                                    Respectfully submitted,


                                              /s/ David Moon
                                                        David M. E. Moon, Esq. (Bar No. 1047947)
                                                        Sarah M. Mugmon, Esq. (Bar No. 1032540)
                                                        THE LIPP LAW FIRM, PC
                                                        4000 Legato Road, Ste. 1100
                                                        Fairfax, Virginia 22033
                                                        (703) 896-7704
                                                        david@lipplawfirm.com
                                                        sarah@lipplawfirm.com
                                                        *Counsel for Plaintiff Sue Lee*



## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


                                              /s/ David Moon
                                                        David M. E. Moon, Esq.