**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SUE LEE,<br><br>Plaintiff and Defendant-in-Counterclaims<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, *et al.*,<br><br>Defendants and Counterclaimants. | Civil Action No. 21-1006 (CKK) |

**MEMORANDUM OPINION**[1]
(November 4, 2026)

This case arises from disputes about the circumstances of Plaintiff Sue Lee's termination from her employment at the Public Company Accounting Oversight Board ("PCAOB"). Ms. Lee alleges that her termination was a product of unlawful discrimination based on her race, national origin, and political affiliation and that her termination was unlawfully retaliatory. PCAOB and its Chair, William Duhnke, counterclaim that Ms. Lee engaged in conversion, breach of fiduciary duty, and unjust enrichment by taking personal trips from Washington, D.C. to Boston at PCAOB's expense and mischaracterizing those trips as work-related. Ms. Lee alleges that this counterclaim is an abuse of process. The parties have filed cross-motions for summary judgment, which are ripe for decision. Upon consideration of the parties' submissions,[2] the relevant legal

[1] This Memorandum Opinion was originally issued under seal on October 6, 2026, along with a public Order. This Memorandum Opinion is now being issued publicly with minor redactions to protect confidential identifying information.

[2] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:

- The Defendants' Motion for Summary Judgment ("Def.'s Mot."), Dkt. No. 57, and the accompanying sealed Memorandum ("Def.'s Mem."), Dkt. No. 58-1, a redacted version of which appears at Dkt. No. 77-1;
- The Plaintiff's Sealed Memorandum in Opposition to the Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), Dkt. No. 63, a redacted version of which appears at Dkt. No. 82;
- The Defendants' Sealed Reply in Support of its Motion for Summary Judgment ("Def.'s Reply"), Dkt. No.

authority, and the entire record, the Court concludes that the Defendants are entitled to summary judgment on Ms. Lee's claims of discriminatory and retaliatory termination and her claims of abuse of process, but not her claims of a hostile work environment. The Court further concludes that Ms. Lee is entitled to summary judgment on the Defendants' counterclaim for conversion, but not their counterclaims for breach of fiduciary duty or unjust enrichment. Accordingly, the Court shall **GRANT IN PART** and **DENY IN PART** both the Defendants' [57] Motion for Summary Judgment and the Plaintiff's [60] Motion for Summary Judgment.

## I. BACKGROUND

The following facts are stated in the light most favorable to the non-movant on each relevant issue. These facts are either undisputed or not genuinely disputed because the non-movant has not shown the existence of such a dispute by "citing to particular parts of materials in the record" that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c), (e).

### A. Ms. Lee's Employment at PCAOB

Plaintiff Sue Lee served as a senior employee of the Public Company Accounting Oversight Board ("PCAOB") from February 2019 until her termination in October 2020. *See* Def.'s Stmt., Dkt. No. 58-2, ¶¶ 10, 48–50. Ms. Lee joined the Board's staff as Chief Risk Officer after applying unsuccessfully for the role of General Counsel. *Id.* ¶¶ 2, 5, 9–10. Some Board members did not support her candidacy for General Counsel because they concluded that she did

---

68-1, a redacted version of which appears at Dkt. No. 78-1;

- The Plaintiff's Sealed Motion for Summary Judgment on the Defendants' Counterclaims ("Pl.'s Mot."), Dkt. No. 60, a redacted version of which appears at Dkt. No. 81;
- The Defendants' Sealed Memorandum in Opposition to the Plaintiff's Motion ("Def.'s Opp'n"), Dkt. No. 61-1, a redacted version of which appears at Dkt. No. 79-1; and
- The Plaintiff's Sealed Reply in Support of her Motion for Summary Judgment ("Pl.'s Reply"), Dkt. No. 70, a redacted version of which appears at Dkt. No. 83.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court. *See* LCvR 7(f).

not have sufficient regulatory experience to serve in the role. *Id.* ¶ 5. However, the Board's Chair, William Duhnke, did support her candidacy and was in favor of offering her the position. *Id.* ¶ 4. When the Board did not approve Ms. Lee for the role of General Counsel, Mr. Duhnke instead hired her for the role of Chief Risk Officer, which did not require Board approval. *Id.* ¶¶ 7, 9.

About six months after Ms. Lee joined PCAOB's staff, Mr. Duhnke promoted her to the role of Acting Chief Administrative Officer. *Id.* ¶ 11. A few months later, with the Board's approval, Mr. Duhnke installed Ms. Lee as the organization's permanent Chief Administrative Officer. *Id.* ¶¶ 12–13.

**B. Ms. Lee's Allegations of Hostile Treatment**

Ms. Lee alleges that Mr. Duhnke created a hostile work environment by making frequent, negative comments about China, people of Chinese descent, and Democrats to her and in her presence during her employment at PCAOB. Pl.'s Resp., Dkt. No. 63-1, ¶¶ 72–81.

For example, Ms. Lee alleges that Mr. Duhnke told her she was among the "good" kind of Chinese people because her family was from Taiwan, comparing her to then-Transportation Secretary Elaine Chao. *Id.* ¶ 54, 72. Ms. Lee also alleges that, during the early days of the COVID-19 pandemic, Mr. Duhnke referred to the disease as "kung flu" or "China flu" "every time" he discussed the pandemic with her, including during the frequent one-on-one meetings in which they discussed PCAOB's pandemic response. *Id.* ¶ 60 (Pl.'s Resp. to Def.'s Stmt.) (emphasis omitted). Ms. Lee alleges that Mr. Duhnke described COVID-19 as having been "cooked up" by China, which he described as "backwards" and "a nation of a billion communists," and he criticized Chinese leaders for wearing masks because, he said, "[t]hey're the ones who started it." *Id.* ¶¶ 75–77. She also alleges that Mr. Duhnke criticized her for offering to source personal protective equipment from China. *Id.* ¶ 81. Ms. Lee alleges and has testified that many other employees were present when Mr. Duhnke made many of these comments. Def.'s Stmt. ¶ 57.

Ms. Lee further alleges that, after Mr. Duhnke learned in early 2020 that she was a Democrat, he frequently invited her to "come on over" to the Republican Party and to "take the red pill," which she understood to refer to becoming a conservative Republican. Pl.'s Stmt. ¶ 73. She alleges that he frequently described Democrats as "alarmist" regarding COVID-19. *Id.* ¶ 80. And she alleges that other staff followed Mr. Duhnke's lead by making comments about her Democratic affiliation, mocking Democrats in general, and inviting her to "get on the right side." *Id.* ¶ 83.

Ms. Lee alleges that she verbally reported this behavior to PCAOB's Chief Human Resources Officer. Pl.'s Stmt. ¶ 62 (Pl.'s Resp. to Def.'s Stmt.).

The Defendants dispute Ms. Lee's account, proffering testimony from Mr. Duhnke denying Ms. Lee's allegations of inappropriate comments; testimony from PCAOB's Chief Human Resources Officer that Ms. Lee never reported any such comments; and testimony from others stating that they never heard them. *See* Def.'s Stmt. ¶¶ 60–62. The Defendants further proffer that, after "multiple rounds of searches" of Ms. Lee's email and internal messages, they have not located any communications in which Ms. Lee references discriminatory or harassing comments by Mr. Duhnke, despite her allegation that she informed multiple PCAOB employees about the alleged comments in writing. *Id.* ¶¶ 58, 65. The Defendants further note that, in connection with an unrelated whistleblower investigation that took place less than one month before her suspension, Ms. Lee told investigators that Mr. Duhnke had never asked her political affiliation. *Id.* ¶¶ 63–64.

### C. The Workday Project

During Ms. Lee's tenure as Chief Administrative Officer, PCAOB was working on an initiative to consolidate its payroll, timekeeping, finance, and other functions onto a single

platform. Def.'s Stmt. ¶ 14. This initiative, called the "Workday Project," involved many of the functions that Ms. Lee oversaw in her role as Chief Administrative Officer. *See id.*

As the Workday Project progressed, at least one employee expressed concern to Mr. Duhnke about Ms. Lee's management style and approach to the project. Def.'s Stmt. ¶ 17. Mr. Duhnke came to understand that some employees were concerned that Ms. Lee was micromanaging the project and slowing its progress. *Id.*

After receiving this feedback, Mr. Duhnke added two employees to the steering committee for the Workday Project. *Id.* ¶ 18. One of these employees—Mr. Duhnke's Chief of Staff—advised Ms. Lee and others working on the project that the two new committee members were participating on behalf of the Chair's Office and that they would be taking a more active role in the project going forward. *See id.* ¶ 19–20.

A few days later, in early October 2019, Ms. Lee convened a meeting of employees assigned to the Workday Project. *Id.* ¶ 21. During this meeting, Ms. Lee made comments that some employees interpreted as threatening or potentially retaliatory, including a reference to the "consequences" of having involved the Chair's Office in the project. *Id.* ¶¶ 23 (Pl.'s Resp. to Def.'s Stmt.), 24 (Def.'s Stmt.). At least one employee interpreted Ms. Lee's comments to mean that she believed team members who had raised concerns about the Workday Project had done something wrong, for which there would be negative repercussions. *Id.* ¶¶ 23–24.

After this meeting, PCAOB's Chief Human Resources Officer and Chief Financial Officer, both of whom had attended the meeting that Ms. Lee convened, agreed that they should inform the Chair's Office about Ms. Lee's comments. *Id.* ¶¶ 22, 25.

**D. Ms. Lee's Travel**

Around the same time, PCAOB's Chief Financial Officer identified a separate set of concerns related to Ms. Lee's travel at PCAOB's expense. *See* Def.'s Stmt. ¶¶ 26–27. Although

Mr. Duhnke had imposed a mandatory no-travel policy in response to the COVID-19 pandemic, Ms. Lee had filed expense reports for more than 30 business trips to the Boston area. *Id.* ¶¶ 28. Although Ms. Lee was working at the time on identifying a new office space for PCAOB's staff in the greater Boston area and was expected to travel there at least occasionally to facilitate the move, the frequency of her trips prompted concerns among some PCAOB staff. *See id.* ¶ 28 (Def.'s Stmt., Pl.'s Resp. to Def.'s Stmt., & Def.'s Reply).

PCAOB's Chief Financial Officer raised these concerns to the Chief Human Resources Officer, who suggested that she should report the concerns to the Chair's Office. *Id.* ¶¶ 29–30.

**E. PCAOB's Investigation**

PCAOB's Chief Financial Officer and Chief Human Resources Officer presented their concerns to the Chair's Chief of Staff, who reported them to Mr. Duhnke. Def.'s Stmt. ¶¶ 31–32. Mr. Duhnke then expressed concern to the Chief Human Resources Officer, opining that Ms. Lee's reported conduct was "unacceptable" and could lead to her termination. *Id.* ¶ 33.

After consulting with the Chief Human Resources Officer about how to proceed, Mr. Duhnke directed PCAOB's Office of Internal Oversight and Performance Assurance ("IOPA") to investigate the allegations about Ms. Lee's oversight of the Workday Project and her travel to Boston. *Id.* ¶¶ 35–37. Mr. Duhnke suspended Ms. Lee's employment pending the outcome of this investigation. *Id.* ¶ 41. Mr. Duhnke also informed the Board of his concerns, noting that he planned to terminate Ms. Lee's employment if the IOPA investigation substantially confirmed the allegations against her. *See id.* ¶¶ 42, 49 (Def.'s Reply). None of the Board members objected to Mr. Duhnke's proposal. *See id.*

The IOPA investigation team met with witnesses and reviewed Ms. Lee's expense reports and receipts. It also reviewed relevant emails and travel records. Based on this investigation, the team prepared a report, which it delivered to the Board. *Id.* ¶ 45.

In its report, the IOPA team concluded that Ms. Lee's conduct in connection with the Workday Project was "not necessarily in violation of the Ethics Code or Anti-Retaliation Policy," but that her conduct had "failed to reflect the spirit of" those policies and "failed to demonstrate responsible leadership, jeopardizing the timely and successful implementation of a key Board initiative." *Id.* ¶ 46.

The IOPA team also concluded that Ms. Lee took 36 trips to the Boston area in the one-year period from October 2019 to October 2020. *Id.* ¶ 47. Its report noted that Ms. Lee was involved in projects that may have necessitated some travel to Boston, but it concluded that IOPA was "unable to account for the high level of travel" and was "unable to find any reasonable explanation for the extent" of it. *Id.* It further noted that there were "inconsistencies and/or misrepresentation in Ms. Lee's expense justifications," which appeared to some staff to be consistent with "a pattern of seeking personal benefit." *Id.* However, the report also acknowledged that PCAOB does not require pre-authorization of travel, and it noted that "further input from Ms. Lee may be necessary to determine conclusively that her travel exceeded what was required." *Id.*

**F. Ms. Lee's Termination**

Soon after Mr. Duhnke received the IOPA report, he notified other members of the Board that he had decided to terminate Ms. Lee's employment. Def.'s Stmt. ¶¶ 48–49. He notified Ms. Lee of his decision by phone the same day. *Id.* ¶ 50.

After her termination, Ms. Lee's counsel contacted PCAOB and asserted claims of discrimination. *See id.* ¶¶ 66–71. During discussions of a potential pre-suit resolution, PCAOB's counsel proposed that if the parties could reach a negotiated settlement, PCAOB would not pursue

counterclaims "for expenses that she inappropriately claimed from the PCAOB" in connection with her Boston travel. *Id.* ¶ 70.[3] The parties did not reach a negotiated resolution.

### G. Ms. Lee's Lawsuit

Ms. Lee later filed this action in D.C. Superior Court, alleging one count of discrimination on the basis of political affiliation, race, and national origin, in violation of the D.C. Human Rights Act. *See* Compl., Dkt. No. 1-1. The Defendants removed the action to this Court, citing PCAOB's authority under the Sarbanes–Oxley Act to remove state-law claims against it to federal court. *See* Notice of Removal, Dkt. No. 1. PCAOB then asserted three counterclaims against Ms. Lee, alleging that her travel to the Boston area at its expense amounted to conversion, breach of fiduciary duty, and unjust enrichment. *See* Def.'s Answer & Counterclaim, Dkt. No. 11. Ms. Lee then amended her complaint to add claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as well as a claim of abuse of process arising from PCAOB's assertion of counterclaims against her. *See* Am. Compl., Dkt. No. 18.

At the parties' request, this Court referred this matter to a magistrate judge for mediation. *See* Joint Status Report, Dkt. No. 24; Order, Dkt. No. 25. However, mediation was ultimately unsuccessful, and the parties proceeded to discovery. *See* Joint Status Report, Dkt. No. 31; Minute Order (Mar. 14, 2022); Order, Dkt. No. 33.

After the conclusion of discovery, the parties filed cross-motions for summary judgment. *See* Def.'s Mot., Dkt. No. 58; Pl.'s Mot., Dkt. No. 60. These motions are ripe for decision.

## II. LEGAL STANDARD

A court must grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[3] While settlement discussions are ordinarily confidential, the Court notes that both parties quote from this discussion in their public filings. *See, e.g.*, Pl.'s Resp. to Def.'s Stmt. ¶ 70; Def.'s Reply to Pl.'s Resp. ¶ 70.

law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party "do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–466 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–250 (internal citations omitted).

Recognizing the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, courts approach summary judgment in an action for employment discrimination or retaliation with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–880 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Still, a plaintiff is not relieved of the burden to support the relevant allegations with competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009) (ESH). On every issue on which the plaintiff would bear the burden of proof on a dispositive issue at trial, the plaintiff bears the burden of production at summary judgment to designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

## III. ANALYSIS

### A. Ms. Lee's Discrimination Claims (Counts I and III)

Ms. Lee alleges that Defendants terminated her because of her ethnicity, national origin, and political identity, in violation of Title VII of the Civil Rights Act of 1964 and the D.C. Human Rights Act. Defendants are entitled to summary judgment on these claims.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the D.C. Human Rights Act ("DCHRA"), makes it unlawful for an employer to take adverse employment

actions "wholly or partially for a discriminatory reason based upon the actual or perceived . . . race . . . of any individual." D.C. Code § 2–1402.11(a), (a)(1).

Where, as here, the plaintiff brings claims of employment discrimination under Title VII and the DCHRA that are based on circumstantial evidence, rather than direct evidence of intentional discrimination, courts apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 18 (D.D.C. 2008) (RBW) ("The legal standard for establishing discrimination under the DCHRA is substantively the same as under Title VII.").

Under the *McDonnell Douglas* framework, "[t]he employee must first make out a *prima facie* case of . . . discrimination." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). "The employer must then come forward with a legitimate reason for the challenged action." *Id.* "If that burden is met, the district court must conduct one 'central inquiry' in deciding an employer's motion for summary judgment: 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Id.* (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)); *see also Brady v. Office of Sgt. at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008) (instructing that district courts "need not—*and should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*" once an employer has asserted a "legitimate, non-discriminatory reason for the decision" the employee challenges).

In resolving the "central question" at the third step of the *McDonnell Douglas* analysis, courts consider "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination

that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (citation and internal quotation marks omitted).

Here, Defendants have met their initial burden of producing "admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions." *Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019). According to Defendants, Mr. Duhnke ended Ms. Lee's employment because of the concerns other employees raised to him about the Workday Project and Ms. Lee's extensive travel to Boston, which he concluded had been substantiated by IOPA's report following its investigation. Def.'s Stmt. ¶ 17, 28, 48. Defendants have proffered admissible evidence in support of this explanation, including the IOPA report itself and the testimony of Mr. Duhnke and other senior PCAOB employees. *See, e.g.,* Def.'s Stmt. ¶ 45–48 (concluding that, "[d]uring the one-year period of October 10, 2019 to October 10, 2020, Ms. Lee took 36 trips to the Boston area," and "[w]e are unable to account for the high level of travel").

Because PCAOB has proffered a nondiscriminatory reason for its decision, the Court "need not . . . decide whether [Ms. Lee] actually made out a *prima facie* case" of discrimination. *Brady*, 520 F.3d at 494 (D.C. Cir. 2008). Instead, the summary judgment analysis turns on whether Ms. Lee's evidence is sufficient to allow a reasonable jury to conclude that PCAOB's stated reason for ending her employment was a pretext for unlawful discrimination or retaliation. *See Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015).

To withstand a motion for summary judgment, the plaintiff's evidence "must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1096.

The issue is not "the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)). Accordingly, challenges that "weaken but do not fully undermine the [employer's] proffered justification" are not necessarily sufficient to defeat a motion for summary judgment. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008).

Here, Ms. Lee fails to demonstrate that a reasonable jury could find that PCAOB's stated reasons for ending her employment were a pretext for unlawful discrimination.

*i. Consistency of Reasons for Termination*

*First*, Ms. Lee argues that "Defendants offer inconsistent and contradictory reasons" for her termination. Pl.'s Opp'n at 12. Ms. Lee argues that when Mr. Dunhke fired her, he mentioned "only that her 36 trips to Boston was 'ridiculous,'" but PCAOB's counsel later claimed that "the issues surrounding Workday . . . played a central role in the decision to dismiss Ms. Lee." *Id.*

As Ms. Lee emphasizes, "[w]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual." *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (citation and quotation marks omitted). Here, however, it is undisputed that Defendants discussed and investigated *both* Ms. Lee's behavior during the Workday meeting and her travel to Boston, leading up to her termination. Def.'s Stmt. ¶ 31–35, 42, 43–50 (PCAOB investigating both sets of allegations); *see also* Pl.'s Resp. to Def.'s Stmt. ¶ 37. Indeed, Ms. Lee primarily disputes the inconsistent *emphasis* on the two reasons for her termination, rather than suggesting a new reason for her termination was created wholesale. Pl.'s Opp'n 12–13 (noting Defendants' description of the "central" and "ancillary" reasons for her termination). Accordingly, Defendants' "overarching rationale" for Ms. Lee's termination

remained consistent, and any inconsistencies in emphasis are insufficient to demonstrate pretext. *Montgomery v. Gotbaum*, 920 F. Supp. 2d 73, 81 (D.D.C. 2013) (RLW); *see also Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 398–399 (D.C. Cir. 2020) (no pretext where employer's explanations "sing the same tune").

*ii. Conclusions of Investigation into Workplace Behavior*

*Second*, Ms. Lee disputes the conclusions of the Defendants' investigation into her workplace behavior. Pl.'s Opp'n at 14. Ms. Lee argues that she did not "stake out a retaliatory posture" toward the Workday team employees; that her travel to Boston was business-related; and that the "IOPA investigation was neither 'thorough' nor 'balanced.'" *Id.* at 14–19.

"A plaintiff can establish that an employer's stated reason for the adverse employment action was a pretext for discrimination by showing that 'the employer is making up or lying about the underlying facts that formed the predicate for the employment decision.'" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495). However, "[i[f the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

Here, Ms. Lee fails to show that Defendants' beliefs about her misconduct were unreasonable. There is considerable evidence in the record, which is substantially not rebutted, that indicates that Defendants believed that Ms. Lee had expensed a high level of travel—36 trips from Washington, DC, to Boston in a one-year period—with no "reasonable explanation," and that several Workday employees raised concerns about her conduct during Workday meetings. Def.'s Stmt. ¶¶ 46–47. IOPA's investigation corroborated this evidence, and Mr. Duhnke terminated Ms. Lee following this investigation. Def.'s Stmt. ¶ 48. Although Ms. Lee argues that Defendants

should have interviewed more witnesses[4] and provided more specific evidence that she "conducted personal business while in Boston," Pl.'s Opp'n at 40, the Court finds no basis in the record upon which a reasonable jury could conclude that Defendants' stated reasons for firing her were pretextual. *See* Def.'s Reply at 8–9 (cataloging Defendants' conclusions following the IOP investigation); *see also Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) ("Title VII, it bears repeating, does not authorize a federal court to become a super personnel department that reexamines an entity's business decisions.") (citation and quotation marks omitted).

*iii. Comparator Evidence*

*Third*, Ms. Lee argues that comparisons between her case and those of two other former PCAOB employees support an inference of discrimination, but these comparisons are unavailing.

"One way to discredit an employer's justification is to show that similarly situated employees of a different race received more favorable treatment." *Royall*, 548 F.3d at 145. "For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate that she and the alleged similarly-situated employee were charged with offenses of comparable seriousness, and that all of the relevant aspects of her employment situation were nearly identical to those of the other employee." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (citation and quotation marks omitted). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* (citation omitted).

---

[4] Ms. Lee alleges, for example, that the IOPA investigation into the Workday project "was based on interviews with only five of the approximately twenty-four people associated with the project," but Ms. Lee does not explain how interviews with more employees would have resulted in a different narrative. Pl.'s Opp'n at 7–8.

Ms. Lee first identifies [redacted] as a comparator. Pl.'s Opp'n at 25. Ms. Lee alleges that while [redacted] was a "white male" who was also subject to complaints from subordinates for his management style, [redacted] was not fired immediately following the complaints. *Id.* However, the record demonstrates that complaints against [redacted] predated, by several years, the tenure of Mr. Dunhke or any PCAOB board members serving when Ms. Lee was terminated. Def.'s Reply at 13. As the Court explained when resolving Plaintiff's [45] Motion to Compel Discovery, the temporal scope of comparator evidence is limited to the tenure of the Board members who made the decision to terminate Ms. Lee's employment. *See* Memorandum Opinion, Dkt. No. 53, at 10–11 (noting that the Board's tenure "should define the period of discovery, particularly so where comparator evidence is limited to a small group of upper-level managers"). Accordingly, Ms. Lee has not demonstrated that a jury could reasonably conclude that "all of the relevant aspects of [her] employment situation were nearly identical to those of" [redacted] *Burley*, 801 F.3d at 301 (citation omitted); *see id.* (noting that whether a comparator was "disciplined by the same supervisor" is a factor bearing on whether someone is an appropriate comparator).

Ms. Lee proposes a second comparator, [redacted] another manager who was the subject of workplace complaints. Pl.'s Opp'n at 26. Following an investigation, [redacted] was asked to resign, rather than terminated. *Id.* However, Ms. Lee fails to demonstrate that [redacted] had sufficiently similar employment to her, given that [redacted] did not report directly to Mr. Dunhke. *See* Def.'s Motion at 14; *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 300 (D.D.C. 2015) (rejecting comparator status due to "different pay grades, job levels and the fact that [plaintiff] was a *senior* organization classification and management analyst while [proposed comparator] was not") (emphasis in original).

Moreover, the record shows another substantial difference between Ms. Lee and [redacted] and [redacted]: Ms. Lee's thirty-six trips to Boston in a one-year period. Ms. Lee does not point to any evidence that PCAOB believed that [redacted] and [redacted] had used their positions to acquire material benefits similar to Ms. Lee's extensive travel. Accordingly, given the several substantial differences between Ms. Lee's situation and those of her proposed comparators, the Court finds that a reasonable jury could not conclude, from the evidence provided, that PCAOB's nondiscriminatory reasons for disciplining Ms. Lee more harshly than it disciplined other employees was a pretext for unlawful discrimination.

*iv. The Same-Actor Defense*

*Finally*, Ms. Lee's proffered evidence of pretext is further rebutted by the fact that Mr. Duhnke was a strong proponent of her candidacy for employment with PCAOB and supported granting her promotions before he learned of the conduct that led to her termination. As the D.C. Circuit has explained, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire," especially "when the firing has occurred only a short time after the hiring." *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).

This so-called "same-actor inference" cuts further against inferring a discriminatory motive. *See, e.g.*, *Azumah v. Yellen*, No. 20-cv-2696, 2021 WL 3784323, at *7 (D.D.C. 2021) (CJN) (discussing "same-actor inference"). Recall that when Ms. Lee first applied for a job with PCAOB, the Board did not approve Ms. Lee for the role of General Counsel, and Mr. Duhnke instead hired her for the role of Chief Risk Officer, which did not require Board approval. Def.'s Stmt. ¶¶ 7, 8, 9, 11. Then, six months later, Mr. Dunhke promoted her to the role of Acting Chief

Administrative Officer, and, soon after, installed her as the organization's permanent Chief Administrative Officer. *Id.* ¶¶ 12–13. Only when Mr. Dunhke learned about Ms. Lee's extensive travel to Boston and her conduct with the Workday team did his posture toward her change. *See, e.g.*, Def.'s Stmt. ¶¶ 31–33. The sequence of these events further undermines Ms. Lee's contention that a jury could reasonably infer that Defendants' stated reasons for her termination were a pretext for discrimination.

*v. Conclusion*

In sum, no reasonable jury could find based on the facts of this case that PCAOB's proffered justification for firing Ms. Lee—her extensive travel to Boston and her conduct with the Workday team—was pretextual. Accordingly, the Court shall **GRANT** the Defendants' motion for summary judgment on Ms. Lee's discrimination claims.

**B. Ms. Lee's Retaliation Claims (Counts II and IV)**

Ms. Lee next alleges that the Defendants unlawfully retaliated against her by threatening to file counterclaims against her following her discharge. *See* Am. Compl. ¶¶ 97–104; 110–116. The Defendants are entitled to summary judgment on these claims.

Courts analyze retaliation claims under Title VII and the DCHRA using the same *McDonnell Douglas* framework that applies to discrimination claims. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010). If the plaintiff makes out a *prima facie* case of retaliation by showing that an employer took a "materially adverse action" against the plaintiff because the plaintiff "engaged in a statutorily protected activity," the burden of proof "shifts to the employer to produce a 'legitimate, nondiscriminatory reason' for its actions." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (quoting *Wiley v. Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007)). If the employer produces such a reason, the Court must decide on summary judgment "whether a reasonable jury could infer . . . retaliation from all the evidence." *Id.* (quoting *Carter v. George*

*Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)). At this stage, the court considers both the plaintiff's *prima facie* case as well as "the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action,'" as well as any other evidence of retaliation in the record. *Id.* (quoting *Carter*, 387 F.3d at 878).

Here, the parties do not dispute that Ms. Lee's action—alleging claims of discrimination against PCAB—constituted a protected activity. *See* Pl.'s Opp'n at 37; *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23, 33 (D.D.C. 2009) (RBW) ("[I]t is clear that the filing of a complaint is a protected activity."). However, the parties dispute whether PCAOB's threats to file a Counterclaim, or the filing of a Counterclaim itself, constitute a "materially adverse action" in response to Ms. Lee's protected activity. *See* Pl.'s Opp'n at 37.

As a "general rule . . . a counterclaim does not support a retaliation claim." *Melendez v. Poy Loung DC Grp., LLC*, No. 17-cv-370, 2018 WL 4637007, at *12 (D.D.C. 2018) (CKK); *see also Gross*, 599 F. Supp. 2d at 33 ("The D.C. Circuit has never found that the filing of a counterclaim constitutes an adverse employment action."). After all, filing a counterclaim is often compulsory, given Federal Rule of Civil Procedure 13's requirement that parties file counterclaims that "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim." *See id.* (discussing Fed. R. Civ. P. 13(1)(A)). However, there is an exception to the "general rule that a counterclaim does not support a retaliation claim[,] insofar as 'the filing of a *baseless* pleading can, under certain circumstances, constitute adverse employment action sufficient to state a claim for retaliation.'" *Melendez*, 2018 WL 4637007, at *12 (quoting *Flores v. Mamma Lombardis of Holbrooke, Inc.*, 942 F. Supp. 2d 274, 279 (E.D.N.Y. 2013) (emphasis added)).

Here, no reasonable jury could find that Defendants retaliated against Ms. Lee by filing, or threatening to file, a baseless Counterclaim against her. During settlement negotiations, Defendants' counsel wrote to Ms. Lee's counsel that, as part of any resolution, "the PCAOB will agree not to pursue any claim against [Ms. Lee], including for expenses that she inappropriately claimed from the PCAOB." Def.'s Mem. at 42; Def.'s Stmt. ¶¶ 69–70. Even assuming that this communication constituted an implicit threat against Ms. Lee, a reasonable jury could not find that this threat, or ensuing claim, was "baseless and therefore, an appropriate basis for a retaliation claim," *Melendez*, 2018 WL 4637007, at *12, given the clear evidence in PCAOB's possession that Ms. Lee *had* claimed inappropriate expenses from PCAOB. *See* Def.'s Stmt. ¶¶ 45–47 (IOPA report concluding that "[d]uring the one-year period . . . Ms. Lee took 36 trips to the Boston area, and was reimbursed for related costs of approximately $11k," and "[w]e are unable to account for the high level of travel").

Accordingly, the Court shall **GRANT** the Defendants' motion for summary judgment on Ms. Lee's retaliation claims.

### C. Ms. Lee's Hostile Work Environment Claims (Counts I and III)

Next, Ms. Lee asserts claims under Title VII and the DCHRA that the Defendants unlawfully subjected her to a hostile work environment. Defendants argue that they are entitled to summary judgment on Ms. Lee's hostile work environment claims because the "sole support for [Ms. Lee's] claim is her own self-serving, uncorroborated, and severely undermined testimony." Def.'s Mem. at 30. In response, Ms. Lee argues that summary judgment on her hostile work environment claims is precluded by "genuine disputes of material fact." Pl.'s Opp'n at 30 (internal capitalization removed). The Court agrees with Ms. Lee.

A hostile work environment violates Title VII and the DCHRA when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005). "In evaluating a hostile work environment claim, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (citation and quotation marks omitted).

The Court concludes that a reasonable jury could find Mr. Dunhke's behavior sufficiently severe or pervasive as to create a hostile work environment. Ms. Lee testified that Mr. Dunhke: (1) referred to the COVID-19 pandemic as the "kung flu" and the "Chinese flu" in every discussion with Ms. Lee about the pandemic; (2) "spun conspiracy theories that China had 'cooked up' the virus"; (3) referred to the Chinese as "backwards" and called China "a nation of a billion communists"; and (4) told Ms. Lee she should "come on over" to the Republican party and "take the red pill." Pl.'s Opp'n at 31–32; Pl.'s Resp., ¶¶ 56, 72–81.

Defendants do not dispute that these allegations, if true, would rise to the level of a hostile work environment. Rather, Defendants urge the Court to grant them summary judgment on Ms. Lee's claims of a hostile work environment because Ms. Lee's testimony is "so thoroughly 'undermined as to be incredible.'" Def.'s Reply at 20 (quoting *Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017)). As Defendants note, a court may dismiss an individual's testimony as insufficient to create a genuine dispute of material fact when the "testimony is undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." *Chenari*, 847 F.3d at 747 (citation omitted). For example, "summary judgment is proper when a plaintiff's statement is demonstrably false after review of a 'quite clear[ ]' videotape, or when the testimony is contradicted by 'multiple disinterested witnesses.'" *Id.* (first quoting *Scott v. Harris*, 550 U.S.

372, 378 (2007); and then quoting *Robinson*, 818 F.3d at 10) (citation modified). However, it is "rare" that contrary evidence is powerful enough to come within the scope of this rule. *See id.* (citation omitted).

Although there is evidence in the record that weighs heavily on Ms. Lee's credibility, the Court finds Ms. Lee's testimony sufficient to create a genuine dispute of material fact. As the D.C. Circuit has explained, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *George*, 407 F.3d at 414 (citation and quotation marks omitted). Moreover, in assessing whether genuine factual issues exist, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

While Defendants emphasize that "[e]very witness who has testified has denied that Mr. Duhnke ever made disparaging remarks concerning Ms. Lee's, or anyone's, race, ethnicity, national origin, or political affiliation," Def.'s Reply at 20, Ms. Lee alleges that Mr. Duhnke "made many racist and disparaging comments during one-on-one conversations," Pl.'s Opp'n at 34. The fact that Ms. Lee does not corroborate her claims with evidence from other employees may weigh substantially against her allegations. Nevertheless, given the extent of Mr. Duhnke and Ms. Lee's one-on-one collaboration together as senior employees, the Court cannot say, at this juncture, that there is no genuine dispute as to whether Mr. Dunhke made these comments and subjected Ms. Lee to a hostile work environment. *See Ayissi*, 712 F.3d at 578 (noting that "[o]n summary judgment . . . we cannot resolve this credibility contest" between an employee who alleges his supervisor made a statement, and a supervisor who "denies making [the] statement").

**D. PCAOB's Counterclaim of Conversion (Counterclaim Count I)**

PCAOB asserts three counterclaims against Ms. Lee in this action, each arising from its allegations that Ms. Lee improperly took personal trips to the Boston area at PCOAB's expense by mischaracterizing the trips as work-related. The first of these claims is a claim for conversion. The Court concludes that Ms. Lee is entitled to summary judgment on this claim.

Conversion is "an unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property." *Wash. Gas Light Co. v. Public Serv. Comm'n of D.C.*, 61 A.3d 662, 675 (D.C. 2013) (citation omitted). "[M]oney can be the subject of a conversion claim . . . if the plaintiff has the right to a specific identifiable fund of money." *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013) (ESH) (citation omitted). However, a claim for conversion of money cannot succeed unless it concerns "a specific identifiable fund of money." *Edwards v. Ocwen Loan Serv., LLC*, 24 F. Supp. 3d 21, 30 (D.D.C. 2014) (RJL) (citation omitted); *see also Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 833 n.3 (D.C. 2004) ("As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds.").

Here, PCAOB fails to identify a "specific, identifiable fund of money" that Ms. Lee converted to her own use. *Edwards*, 24 F. Supp. 3d at 30. As Ms. Lee notes, while PCAOB identified the total cost for all of Ms. Lee's travel to Boston, PCAOB "cannot identify the specific amount of money associated with travel that allegedly should not have occurred," given that PCAOB concedes that some of Ms. Lee's travel was for legitimate business. Pl.'s Mot. at 6; *see Headfirst Baseball LLC v. Elwood*, 168 F. Supp. 3d 236, 252 (D.D.C. 2016) (RBW) (granting summary judgment to the defendant where the plaintiff alleged that "funds were stolen" but did not "identif[y] a specific fund of money" that was converted).

Seeming to recognize this limitation in its argument, PCAOB's Opposition argues that "in addition to charging PCAOB for personal travel that she misrepresented as business travel, [Ms. Lee] also took advantage of PCAOB American Airlines flight credits that she earned in her capacity as a PCAOB employee and later used for personal gain." Def.'s Opp'n at 7. PCAOB argues that "[f]light credits held by American Airlines for the benefit of PCAOB are certainly the type of unique account or specific fund – much like a bank account – that can be recovered under a theory of conversion, given that the account is 'specific and identifiable.'" *Id.*

However, multiple courts within this Circuit have recognized that because conversion extends "only to intangible rights identified by a tangible document that is converted . . . a plaintiff may bring a suit for conversion of a promissory note . . . but not for conversion of a debt." *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008) (RMU) (quoting *Primedical, Inc. v. Allied Inv. Corp.*, No. 19-cv-1802, 1994 WL 149139, at *7 (D.D.C. 1994) (NHJ)). Accordingly, several courts within this Circuit have held that credit, including flight credit, is not subject to a conversion claim. *See id.* at 143 ("[T]he plaintiff's frequent flyer miles amounted to credit with the airline, and as such, represented an intangible right that cannot be the subject of a conversion."); *Headfirst Baseball*, 168 F. Supp. 3d at (holding that "alleged unauthorized use of [a company] credit card" is not subject to a conversion claim); *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 258–259 (D.D.C. 2015) (RC) (recognizing "that overcharges or unauthorized charges to a credit card cannot support a conversion claim").

PCAOB makes no attempt to distinguish these cases, and the Court sees no reason to depart from their reasoning. Accordingly, the Court shall **GRANT** Ms. Lee's motion for summary judgment on PCAOB's counterclaim of conversion.

**E. PCAOB's Counterclaim of Breach of Fiduciary Duty (Counterclaim Count II)**

PCAOB next argues that Ms. Lee's alleged personal travel to Boston at PCAOB's expense constituted a breach of a fiduciary duty to PCAOB. To prevail on a claim for breach of fiduciary duty, PCAOB must show "(1) the existence of a fiduciary relationship with the defendant; (2) breach of a duty imposed by that fiduciary relationship; and (3) an injury caused by such breach." *Caesar v. Westchester Corp.*, 280 A.3d 176, 186 (D.C. 2022). The Court finds that a reasonable jury could find in PCAOB's favor on all three elements, and, accordingly, denies Ms. Lee's request for summary judgment on this claim.

Here, a reasonable jury could find that Ms. Lee breached her fiduciary duty as a senior employee at PCAOB. A "diversion of benefits" for an employee's "own personal or professional gain" constitutes a clear breach of fiduciary duty. *Beckman v. Farmer*, 579 A.2d 618, 482 (D.C. 1990); *see also Day v. Sidley and Austin*, 394 F. Supp. 986, 993 (D.D.C. 1975) (BDP) ("The essence of a breach of fiduciary duty between partners is that one partner has advantaged himself at the expense of the firm."). While Ms. Lee argues that her thirty-six trips to Boston were "aligned with and responsive to her job duties," Pl.'s Mot. at 8, a reasonable jury could find, given the evidence in the record, that "a substantial portion for Ms. Lee's travel to Boston was undertaken for personal reasons," given the extent to Ms. Lee's travel, the alleged inconsistencies in her reports, and the fact that she owned a home in Cambridge, Massachusetts. Def.'s Mem. at 21, 25.

For example, PCAOB details several trips where "Ms. Lee arrived too late in the evening and left too early in the morning to conduct any PCAOB business that required her presence in Boston." Def.'s Opp'n at 16; *see id.* at 12 (describing trip where Ms. Lee "routed herself through Boston on both legs of the trip" en route to Chicago, but "arrived too late on the evening . . . and left too early the following morning . . . to perform any substantive work for PCAOB that required her presence in Boston"). PCAOB also details occasions where records demonstrate that Ms. Lee

"traveled all the way to Boston and spent just a few minutes in the office," and argue that a "jury could conclude that she booked the trip for personal reasons and simply attempted to mask the personal nature of the travel with a quick stop in the office." *Id.* at 16. Finally, PCAOB cites evidence that Ms. Lee "omitted" from her reports and presentations evidence of some of her trips to Boston, which could lead a jury to "call[] into question the purpose of the undisclosed trips." *Id.* at 20–21. Despite Ms. Lee's protestations that she was traveling for work, a reasonable jury considering this evidence could conclude that Ms. Lee diverted PCAOB's resources for her "own personal . . . gain" and thus breached her fiduciary duty to PCAOB. *Beckman*, 579 A.2d at 482.

Accordingly, Ms. Lee is not entitled to summary judgment on PCAOB's counterclaim of breach of fiduciary duty, and the Court shall **DENY** her motion as to this counterclaim.

**F. PCAOB's Counterclaim of Unjust Enrichment (Counterclaim Count III)**

In PCAOB's third and final counterclaim, it argues that Ms. Lee was unjustly enriched by her allegedly personal travel to Boston at PCAOB's expense. For similar reasons, the Court will deny Ms. Lee's motion for summary judgment under this Counterclaim.

Under District of Columbia law, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008) (quoting *News World Comms., Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C. 2005)).

Here, the Court concludes that a reasonable jury could find in favor of PCAOB on all three factors. Ms. Lee argues that "it is unclear what, if any, benefit the PCAOB conferred on [her]," and that "PCAOB benefited greatly from her travel," given that her trips helped PCAOB to "close the satellite offices"; "quell[ed] discontent from the Boston-area staff over the office move"; and

"allowed the PCAOB to cover necessary administrative tasks due to the absence of other staff" during the pandemic. Pl.'s Mot. at 11-12.

However, a reasonable jury could conclude, that, as PCAOB argues, "Ms. Lee's free trips to Boston, where she owned a home, had extended family, [and] enjoyed personal pursuits . . . certainly amounted to a benefit." Def.'s Opp'n at 25. Moreover, a reasonable jury could conclude that, while PCAOB may have benefited from some of Ms. Lee's travel, PCAOB "obtained no benefit from the trips. . . where there is little to no record of business activity and Ms. Lee's travel records prove that she had no time to conduct any PCAOB business." Def.'s Opp'n at 25–26. Accordingly, Ms. Lee is not entitled to summary judgment on PCAOB's counterclaim of unjust enrichment, and the Court shall **DENY** her motion as to this counterclaim.

### G. Ms. Lee's Abuse of Process Claim (Count V)

Finally, in response to PCAOB's counterclaims, Ms. Lee brings a claim of abuse of process. "There are two basic elements for an abuse of process claim: (1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 68 (D.D.C. 2014) (RC) (quotations omitted). PCAOB is entitled to summary judgment on this claim.

Ms. Lee argues that PCAOB used its "counterclaims against Ms. Lee to tarnish her professional reputation, constituting an abuse of process." Pl.'s Opp'n at 41. However, as PCAOB notes, under District of Columbia law "even an allegation that a plaintiff knowingly brought suit on an unfounded claim is not by itself an abuse of process." Def.'s Mem. at 44 (quoting *Kopff v. World Research Grp., LLC*, 519 F. Supp. 2d 97, 100 (D.D.C. 2007) (PLF)); *see also Kopff*, 519 F. Supp. 2d at 100 ("In short, simply filing a lawsuit is not actionable [as an abuse of process,] regardless of the motive that may have prompted the suit."). Ms. Lee further alleges that the "public nature of the counterclaims negatively affected Ms. Lee's efforts to find subsequent

employment," Pl.'s Opp'n at 41, but, "as this Court has noted before, such results are the unhappy incident of almost any litigation and are an insufficient basis for an abuse of process counterclaim," *Kopff*, 519 F. Supp. 2d at 100.

Accordingly, Ms. Lee's abuse of process claims are plainly foreclosed, and the Court shall **GRANT** PCAOB's motion for summary judgment on Ms. Lee's abuse of process claim.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT IN PART** and **DENY IN PART** both the Defendants' [57] Motion for Summary Judgment and the Plaintiff's [60] Motion for Summary Judgment. Specifically, the Court shall **GRANT** the Defendants' [57] Motion as to the Plaintiff's claims of discriminatory and retaliatory termination and her claims of abuse of process, and the Court shall **GRANT** the Plaintiff's [60] Motion as to her claim of conversion. The Court shall otherwise **DENY** each party's Motions.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Dated:** November 4, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge